# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00153-SCT

*CHARLES NORMAN, JR., INDIVIDUALLY AND
ON BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF CHARLES NORMAN, SR.,
AND THE ESTATE OF PAT NORMAN*

*v.*

*ANDERSON REGIONAL MEDICAL CENTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/01/2016 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON, JR. |
| TRIAL COURT ATTORNEYS: | H. WESLEY WILLIAMS, III |
| | CHRIS J. WALKER |
| | CLAIRE FRANCES STAMM |
| | ROMNEY HASTINGS ENTREKIN |
| | PEELER GRAYSON LACEY, JR. |
| | SHIRLEY M. MOORE |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRIS J. WALKER |
| | H. WESLEY WILLIAMS, III |
| ATTORNEYS FOR APPELLEE: | ROMNEY H. ENTREKIN |
| | P. GRAYSON LACEY, JR. |
| | SHIRLEY M. MOORE |
| | BENJAMIN B. MORGAN |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 01/24/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     The estate and beneficiaries of Charles Norman, Sr., appeal the trial court's exclusion

of Norman's medical experts and grant of summary judgment in favor of Anderson Regional

Medical Center. Because the trial court properly found that Norman's experts' testimony lacked sufficient foundation in the medical literature and because no genuine issue of material fact remains, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On December 12, 2011, Charles Norman, Sr., was admitted to Anderson Regional and underwent a cardiac catheterization with stent placement, which was performed by his cardiologist, Dr. Michael Purvis. Dr. Purvis performed the procedure without significant complication, and he expected to discharge Norman two days later.

¶3. At some point during the overnight hours of December 13 to 14, 2011, Norman suffered an ischemic stroke. Norman's wife complained to nursing staff that she observed symptoms of a stroke as early as 7:00 a.m. the next morning, which the nurses documented in Norman's chart at 8:00 a.m. Neither Dr. Purvis nor any other medical doctor was notified of the stroke until much later in the day. In fact, Dr. Purvis first became aware of the stroke when he made his rounds around 2:30 that afternoon. Dr. Purvis then consulted Dr. Jimmy Wolfe, a neurologist, who performed a CT scan that confirmed Norman had suffered a stroke. By the time the doctors became aware of the stroke (at least seven and a half hours after Norman's wife first complained to the nursing staff), the time frame within which tissue plasminogen activator ("tPA")—a "clot-buster" drug used to restore blood flow to a stroke victim's brain—is to be effectively administered had passed.

2

¶4. Norman remained at Anderson Regional two to three days after he had his stroke. He was then transferred to a step-down unit for rehabilitation before finally being transferred to Bedford Nursing Home at Marion, Mississippi, where he remained for the rest of his life. Following the stroke, Norman could no longer care for himself, provide for his family, or enjoy the quality of life he was accustomed to.

¶5. Norman sued Anderson Regional a little more than a year before his death in the Circuit Court of Lauderdale County. Both Norman and his wife have since died. The decedents' estates were substituted as plaintiffs and real parties in interest. Norman alleges that Anderson Regional, by and through the nurses on duty when Norman suffered the stroke, was negligent in its care and treatment of Norman in December 2011.[1]

¶6. Anderson Regional subsequently stipulated that its nurses breached the applicable standard of care by not recognizing and reporting Norman's stroke symptoms to a physician earlier. Anderson Regional further conceded that the nursing staff's delay in reporting Norman's stroke prevented the possible administration of tPA. Anderson Regional, however, denied that Norman was ever a candidate for tPA administration, noting that Norman was a "75-year-old, brittle diabetic with a relevant medical history that was positive for atrial fibrillation, hypertension, low ejection fraction, and coronary artery disease."[2]

---

[1]Anderson Regional and John Does 1-10 are the only named defendants in this case.

[2]It was later discovered that Norman had sustained a prior, unreported stroke approximately two months earlier, but that stroke is not at issue in the current litigation.

¶7.   Anderson Regional filed motions to strike and/or exclude Norman's experts: Dr. Harmut Uschmann, Dr. Michael Winkelmann, and Dr. Daisy Marie Thomas. Dr. Uschmann and Dr. Winkelmann both opined that Norman would have had a greater than 50 percent chance of a better outcome had Anderson Regional complied with the applicable standard of care and administered tPA in a timely fashion. Dr. Thomas opined that Anderson Regional's failure to give Norman tPA prevented his recovery and contributed to his death.

¶8.   Anderson Regional filed its motion for summary judgment based on the premise that Dr. Uschmann's testimony should be excluded.[3] After hearing arguments, the trial court entered its Memorandum Opinion and Order granting summary judgment in favor of Anderson Regional. The trial court concluded that Norman's experts' opinions were neither based on nor supported by reliable data (i.e., the medical literature) regarding the probability tPA would have been effective even if it had been timely administered. As a result, Norman failed to prove by a preponderance of the evidence that he would have had a greater than 50 percent probability of a substantially better outcome had his stroke been timely diagnosed and had tPA been timely administered.

¶9.   Norman now appeals.

---

[3]Norman's entire argument on appeal revolved around Dr. Uschmann's testimony alone.

4

**DISCUSSION**

¶10. This appeal challenges this Court's longstanding precedent adopting the loss-of-chance causation standard in medical-malpractice cases. For Norman to recover under our loss-of-chance causation standard, he must prove a greater than 50 percent chance of a substantially better outcome had Anderson Regional timely recognized and reported his stroke and administered tPA.

¶11. This Court reviews a trial court's grant of summary judgment de novo. *Kilhullen v. Kan. City S. Ry.*, 8 So. 3d 168, 174 (Miss. 2009). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c). Evidence will be viewed in the light most favorable to the nonmoving party. *Kilhullen*, 8 So. 3d at 174-75.

I.     **Whether the trial court properly excluded Norman's experts and granted summary judgment on the basis that the expert opinions lacked sufficient foundation in the medical literature.**

¶12. To establish a *prima facie* case of medical malpractice under Mississippi law, a plaintiff must prove by a preponderance of the evidence (1) the applicable standard of care; (2) a failure to conform to the required standard; and (3) an injury proximately caused by a defendant's noncompliance with the standard. *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508 (Miss. 2015). As a rule, the plaintiff must demonstrate each of these elements

5

through medical-expert testimony, and the expert must articulate and identify the standard of care that was breached and establish that the breach was the proximate cause or the proximate contributing cause of the alleged injuries. *Hubbard v. Wansley*, 954 So. 2d 951, 957 (Miss. 2007). Because Anderson Regional stipulated it breached the standard of care, this Court's analysis focuses solely on the issue of causation.

¶13. Mississippi law does not require a plaintiff to prove causation with certainty. *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985). Mississippi law requires proof of causation to a degree of reasonable medical probability that—absent the alleged malpractice—a significantly better result was probable, or more likely than not (i.e., a greater than 50 percent chance of a substantially better outcome than was in fact obtained). *Id.*; *Ladner v. Campbell*, 515 So. 2d 882, 889 (Miss. 1987). In Mississippi, the threshold of proof required for recovery has been termed the "loss of chance." *Clayton*, 475 So. 2d at 444.

¶14. This Court first addressed Mississippi's loss-of-chance standard in *Clayton*, in which we concluded that "Mississippi law does not permit the recovery of damages because of mere diminishment of the 'chance of recovery.'" *Id.* at 445. *Clayton* clearly placed Mississippi in line with those jurisdictions that require a plaintiff to show that "proper treatment would have provided the patient 'with a greater than 50 percent chance of a better result than was in fact obtained,'" and *Ladner* reaffirmed the notion first established in *Clayton* that a mere "better result absent malpractice" fails to meet the requirements of causal connection. *Ladner*, 515 So. 2d at 889. This Court has since applied Mississippi's loss-of-chance

standard consistently in cases such as *Hubbard* and *White*, adhering to our current and longstanding precedent that "[p]ossibilities will not sustain a verdict." *Kramer Serv., Inc. v. Wilkins*, 184 Miss. 483, 497, 186 So. 625, 627 (1939) (quoting *Ill. Cent. R.R. v. Cathey*, 70 Miss. 332, 338, 12 So. 253 (1892)); *Griffith v. Entergy Miss., Inc.*, 203 So. 3d 579, 589 (Miss. 2016) ("[V]erdicts are to be founded upon probabilities . . . and not upon possibilities[.]").

¶15.    In its Memorandum Opinion and Order summarily dismissing Norman's claims, the trial court cited *King v. Singing River Health System*[4]—a factually analogous case involving the timely administration of tPA—as controlling authority. In *King*, the trial court similarly granted the defendants' motions to exclude the plaintiffs' expert testimony because the expert's opinions were not based on reliable data. *King*, 158 So. 3d at 320. The trial court in *King* found that plaintiffs' expert was unable to cite any medical literature to support his opinion that the decedent would have had a greater than 50 percent chance of improvement had her stroke been treated as she claimed it should have been. *Id.* King's expert based his opinions on four studies measuring the efficacy of tPA on stroke patients, two of which are the subjects of dispute in the current case[5]—the 1995 NINDS study[6] and the 2008 ECASS-III

---

[4]*King v. Singing River Health Sys.*, 158 So. 3d 318 (Miss. Ct. App. 2014).

[5]Norman's experts also relied upon the 2008 Safe Implementation of Treatments in Stroke-Monitoring Study (the "SITS-MOST study").

[6]The National Institute of Neurological Disorders and Stroke rt-PA Stroke Study Group (the "NINDS study").

7

study.[7] *Id.* at 327. The Mississippi Court of Appeals affirmed and found that, because the NINDS and ECASS-III studies supported approximately 12 and 7 percent chances for improvement in stroke patients respectively, King's expert testimony lacked sufficient support in the medical literature and failed to satisfy Mississippi's loss-of-chance standard. *Id.* at 327-29.

¶16.    Consistent with *King*, the trial court concluded that Norman's expert testimony lacked sufficient support within the medical literature. The trial court found that no study, not even the benchmark NINDS study, demonstrates that timely tPA treatment provides a greater than 50 percent chance of a better outcome. As this Court has stated, when an expert renders an opinion that is attacked as "not accepted within the scientific community," the party offering the expert's opinion must, at a minimum, present the trial court with some evidence indicating that the offered opinion has some degree of acceptance in the scientific community. *Hill v. Mills*, 26 So. 3d 322, 332-33 (Miss. 2010); *see also King*, 158 So. 3d at 326 ("[W]here a theory has been studied in the medical literature and an expert's opinion is challenged for being contrary to the medical literature, there must be some support in the medical literature for a medical expert's opinion or some basis for believing that the medical literature is wrong."). Norman failed to present such evidence.

¶17.    Dr. Uschmann testified to a reasonable degree of medical probability based on the above peer-reviewed medical literature that, more probable than not, Norman would have

---

[7]The Third European Co-operative Acute Stroke Study (the "ECASS-III study").

been substantially better off had he timely received tPA. He also testified that "it is more probable than not that Norman suffered from a small-vessel type stroke with a cardioembolic etiology."[8] Anderson Regional challenged Dr. Uschmann's testimony, arguing that it was contrary to the prevailing medical literature and specifically contending that no support exists in the medical literature for the opinion that tPA, or any other supportive stroke care, would have provided Norman with a greater than 50 percent chance of a substantially better outcome.

¶18. Throughout his deposition, Dr. Uschmann repeatedly acknowledged that no support exists in the relevant medical literature for his opinion that tPA would have provided Norman with a greater than 50 percent chance of a better outcome. To be clear, Dr. Uschmann subsequently stated in his amended affidavit, "I am not opining that the absolute benefit of tPA exceeds fifty percent." This clarification, however, no more advances Norman's case than establishes a foundation for Dr. Uschmann's opinion. The undisputed medical evidence demonstrates, and all the experts in this case agree, the effective rate (i.e., the absolute benefit[9]) of timely administered tPA is between 8 and 12 percent—a rate far below

[8]Even considering the effective rate of tPA for this specific type of stroke, as Dr. Uschmann suggested, Norman still fails to satisfy this Court's loss-of-chance standard. Dr. Uschmann himself testified that "[f]or a small-vessel occlusive or small-vessel type stroke, the absolute benefit of tPA is twenty-five (25) percent."

[9]To illustrate the inherent difficulty of using relative measures alone to discern whether a medication would more likely than not cause a patient to improve, assume that a particular medication increases the recovery rate from an illness from 10 to 16 percent. Even though the relative measure of the drug's efficacy is 60 percent (i.e., the proportional increase in efficacy attributable to the medication), the absolute efficacy of the drug is only

the 50 percent threshold required to prove causation. Thus, by Dr. Uschmann's own concessions, Norman's loss-of-chance claim fails as a matter of law.[10]

¶19. The Florida Supreme Court addressed a similar issue in *Cox v. St. Joseph's Hospital*, 71 So. 3d 795 (Fla. 2011). *Cox* is a stroke case involving the failure to administer tPA. The issue was whether the intermediate appellate court impermissibly reweighed legally sufficient evidence of causation from Cox's expert witness that the timely administration of tPA more likely than not would have prevented or mitigated the consequences of the stroke. *Cox*, 71 So. 3d at 799.

¶20. In *Cox*, the hospital's ER staff never obtained or attempted to acquire information about the precise onset time of Cox's stroke symptoms from the responding paramedics, which ultimately deprived Cox the opportunity to receive tPA. *Id.* at 797. Cox's expert, Dr. Nancy Futrell, opined that "to a high degree of medical probability" she believed that if Cox had received tPA, he "would have had a very good recovery and have minimal or no neurological deficit." *Id.* The defendants attacked Dr. Futrell's opinion based on a general contention that the NINDS study did not establish a "more likely than not" chance of improvement from the effects of the stroke. *Id.* at 798.

---

6 percent, thereby indicating that the administration of the medication will almost certainly not cause the patient to improve.

[10]It is worth noting that Dr. Uschmann testified on behalf of Memorial Hospital in *White*. In that case, Dr. Uschmann testified that timely administered tPA supported only a "small chance" or possibility of a substantially better outcome. *White*, 170 So. 3d at 507.

¶21.     Florida follows the same loss-of-chance causation standard that Mississippi follows; however, despite Norman's heavy reliance on *Cox*, we find it easily distinguishable. First, Norman mischaracterizes the issue considered by the Florida Supreme Court in *Cox*. Although Norman frames the issue in *Cox* as "whether the administration of tPA would have prevented or mitigated the . . . consequences of the ischemic stroke," the issue was whether the intermediate appellate court impermissibly reweighed legally sufficient evidence of causation and substituted its own factual findings in place of those of the jury. Thus, the *Cox* court merely considered the sufficiency of the evidence and whether the intermediate appellate court had substituted its own factual findings for those of the jury; it neither disturbed the jury's determination nor did it call into question the trial judge's evidentiary discretion.

¶22.     Second, *Cox* is factually distinguishable. Dr. Futrell did not summarily conclude that it was more probable than not that Cox would have been substantially better off had he timely received tPA, as did Dr. Uschmann. Dr. Futrell testified that Cox would have experienced a "very good recovery" with "minimal or no neurological deficit," and she based her testimony on her own clinical experience administering tPA, the relevant medical literature, and her knowledge of the facts and records available to her. She also explained in great detail—based on a thorough review of Cox's CT scans—why she believed that Cox was an excellent candidate for tPA. Dr. Uschmann did little more than provide summary conclusions of a general nature.

11

¶23. Lastly, in *Cox*, defense counsel attacked Dr. Futrell's testimony as contrary to the medical literature. Unlike Dr. Uschmann, Dr. Futrell neither acknowledged nor conceded that her testimony in fact lacked sufficient support in the medical literature or failed to satisfy the applicable causation standard. Instead, she distinguished the NINDS study and provided a detailed, patient-specific foundation for her opinion. Dr. Uschmann failed to provide a similarly detailed, patient-specific foundation for his opinion and even conceded that no study supports a greater than 50 percent benefit from the timely administration of tPA.

¶24. Our analysis must be guided by Mississippi Rule of Evidence 702, which addresses the admissibility of expert testimony. A witness may testify as an expert to assist "the trier of fact to understand the evidence or to determine a fact issue" if the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and "if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case." Miss. R. Evid. 702.

¶25. Here, Norman failed to prove by a preponderance of the evidence that he would have experienced a greater than 50 percent chance of a substantially better outcome had Anderson Regional timely recognized and reported his stroke and administered tPA. Norman put forth no evidence that Anderson Regional proximately caused or contributed to his eventual death—even had his stroke been timely recognized and reported. Thus, because Norman's expert testimony is not based on reliable data as required by Rule 702, and because it fails

12

to satisfy this Court's loss-of-chance causation standard, no genuine issues of material fact exist. Summary judgment was proper, and we affirm.

**II.    Whether the trial court properly granted summary judgment on Norman's breach-of-contract claim.**

¶26.    Norman asserts that the trial court erred by granting summary judgment on his breach-of-contract claim. He alleges Anderson Regional breached its "Conditions of Admission" to provide "general duty nursing care" when the nursing staff failed to "carry out the instructions of [Norman's] physician" to report changes in his condition and to timely assess, recognize, report, diagnose, and treat Norman for a stroke. According to Norman, this breach and failure to provide "general duty nursing care" ultimately deprived Norman the opportunity to be considered for tPA administration and other early intervention measures and resulted in the foreseeable consequences of loss of livelihood, pain and suffering, emotional distress, and mental anguish.

¶27.    Under Mississippi law, a plaintiff asserting any breach-of-contract claim has the burden to prove by a preponderance of the evidence (1) that a valid and binding contract exists; and (2) that the defendant has broken or breached it without regard to the remedy sought or the actual damage sustained. *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1225 (Miss. 2012) ("Monetary damages are a remedy for, not an element of, breach of contract."), *overruling* *Warwick v. Matheney*, 603 So. 2d 330 (Miss. 1992). The context in which breach of contract was raised controls.

13

¶28.    In *Murray v. University of Pennsylvania Hospital*, 490 A.2d 839, 843 (Pa. Super. Ct. 1985), the Superior Court of Pennsylvania said that a patient may bring an action in tort and also in contract if the doctor entered into a contractual relationship with the patient to produce a particular result from the course of treatment. Whether the patient brings an action in tort, in contract, or in both depends on the nature of the damages sought. *Id.* If the damages are for personal injuries, the action is one sounding in tort; however, if the damages are "intended to give the injured parties the benefit of their bargain," the action is one in contract. *Id.* The holding in *Murray* is consistent with this Court's holding in *Hutchinson v. Smith*, 417 So. 2d 926 (Miss. 1982), in which this Court said that a court must look at the action as a whole to determine if it sounds in tort or in contract.

¶29.    In *McMichael v. Howell*, a patient claimed breach of contract in addition to medical malpractice on the basis of the doctor's alleged failure "to perform the services which [the doctor had] agreed to perform" and negligence in the services and care rendered, which the patient claimed deviated from the applicable standard of care. *McMichael v. Howell*, 919 So. 2d 18, 23 (Miss. 2005). We found that the breach-of-contract argument was "nothing more than medical malpractice" and affirmed dismissal of both claims on the same basis. *Id.* Thus, Mississippi law is clear that in reviewing the trial court's grant of summary judgment on Norman's breach-of-contract claim, this Court must look at the action as a whole to determine if it sounds in tort or in contract.

14

¶30.    The record evidence indicates that Norman's breach-of-contract claim is nothing more than a medical-malpractice claim.  Here, the breach-of-contract claim is very clearly a general claim for breach of medical services.  First, Norman's complaint alleges that Anderson Regional breached a contract "to provide [Norman] reasonable medical services."  Second, Norman argued that Anderson Regional breached the "Conditions of Admission" by failing to provide "general duty nursing care" and by failing to inform the physician of changes to Norman's medical condition—Norman used Anderson Regional's admitted breach of the standard of medical care as proof to support the breach-of-contract claim.  Third, at the summary judgment hearing, the exchanges between the trial court and counsel for both Anderson Regional and Norman established that causation was the only issue before the court.

¶31.    Thus, by Norman's own admission, all of his claims, including the breach-of-contract claim, require proof that Anderson Regional's failure to timely recognize and report the stroke proximately caused Norman's damages.  Even under a breach-of-contract theory, Norman would have to prove causation. *Leard v. Breland*, 514 So. 2d 778, 782 (Miss. 1987) (discussing the but-for causation standard for damages in a breach-of-contract case).  Stated differently, Norman's breach-of-contract claim sounds in tort rather than in contract, and, as such, it is nothing more than a claim for medical malpractice.

¶32.    The trial court did not err in granting summary judgment on the breach-of-contract claim—no genuine issue of material fact exists.  Norman failed to prove that timely

15

recognition of his stroke would have, more probably than not, produced a substantially better outcome, and his claim, whether labeled medical malpractice or breach of contract, remains inconsistent with the undisputed medical facts regarding the low efficacy rate of timely administered tPA.

**III.    Whether this Court should reevaluate Mississippi's loss-of-chance framework in lieu of the reduced-likelihood approach.**

¶33.    Lastly, Norman asserts on appeal that this Court should overrule the loss-of-chance causation standard and instead adopt the reduced-likelihood approach—which Norman contends more accurately reflects the principles of Mississippi's pure comparative-negligence framework.[11]

¶34.    Under the reduced-likelihood approach, compensation is available for negligence even if a patient's chance of improvement is below 50 percent. Guest, *supra* note 11, at 57. If the patient's chance of improvement is less than 50 percent, the decrease in improvement probability is calculated and then multiplied by the full value of damages, so the award is proportional to the incremental decrease in chance. *Id.* Thus, the reduced-likelihood approach "classifies the lost chance as the injury itself," rather than as a standard of causation. Matthew Wurdeman, Comment, *Loss-of-Chance Doctrine in Washington: From*

---

[11]Norman notes that twenty-three states, including Mississippi, have adopted the all-or-nothing approach, while another twenty-three states have adopted the reduced-likelihood approach. For the state-by-state analysis cited by Norman, *see* Lauren Guest, David Schap & Thi Tran, *The "Loss of Chance" Rule as a Special Category of Damages in Medical Malpractice: A State-By-State Analysis*, 21 J. Legal Econ. 53, 59 (2015).

*Herskovits to Mohr and the Need for Clarification*, 89 Wash. L. Rev. 603, 607 (2014).

Norman relies primarily on ***Matsuyama v. Birnbaum***, 890 N.E.2d 819 (Mass. 2008), one of the leading cases on the reduced-likelihood approach, in support of his argument.

¶35.     ***Matsuyama*** involved a negligent failure to diagnose gastric cancer when the patient had a less-than-even chance of surviving the cancer with a timely diagnosis.  ***Matsuyama***, 890 N.E.2d at 823.  As part of its analysis, the ***Matsuyama*** court surveyed the various critiques of the all-or-nothing approach, an approach Norman equates with Mississippi's loss-of-chance causation standard.  The ***Matsuyama*** court noted the following criticisms: (1) the all-or-nothing approach does not serve the basic aim of fairly allocating the cost and risks of human injuries; (2) the all-or-nothing approach fails to deter medical negligence because it immunizes whole areas of medical practice from liability; (3) the all-or-nothing approach fails to provide the proper incentives to ensure that the care patients receive does not fall below the standard of care and skill of the average member of the profession practicing the specialty; and (4) the all-or-nothing approach fails to ensure that victims who incur the real harm of losing their opportunity for a better outcome are fairly compensated for their loss. ***Id.*** at 830.  In summary, the ***Matsuyama*** court chose the injury-based analytical method and viewed the damage not as the ultimate outcome, but as the lost opportunity.  ***Id.*** at 832; *see also* ***Smith v. Providence Health & Servs.-Or.***, 393 P.3d 1106, 1119 (Or. 2017).

¶36.     Norman advocates for a change in the law on the basis of fairness, because often it is the defendant's negligence that has made it impossible to determine whether a more

favorable outcome would have been realized had the patient received the care required by the applicable standard of care. *Matsuyama*, 890 N.E.2d at 834. Norman argues that under the loss-of-chance standard currently followed, this Court immunizes medical-care providers from any negligence associated with the administration of or failure to administer tPA and allows them to hide "behind the all-or-nothing rule."

¶37. In contrast, Anderson Regional points out that "[c]omparative fault does not focus on establishing the third element of the tort—causation." We agree. Mississippi's comparative-negligence statute provides that "*damages* shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured[.]" Miss. Code Ann. § 11-7-15 (Rev. 2004) (emphasis added). As such, in order to recover damages under this statute, a plaintiff would first have to prove by a preponderance of the evidence that a defendant's negligent conduct was both the cause-in-fact and the proximate cause of the resulting injuries. Norman has failed to meet his burden of proof.

¶38. Once the threshold has been met for recovery, comparative negligence would be applied with regard to all factors that may have contributed to the injury. Consequently, we find that "consistency and definiteness in the law are the major objectives of the legal system," and "[a] former decision of this [C]ourt should not be departed from, unless the rule therein announced is not only manifestly wrong, but mischievous." *Hye v. State*, 162 So. 3d 750, 755 (Miss. 2015); *Caves v. Yarbrough*, 991 So. 2d 142, 151 (Miss. 2008) (citation omitted). Here, the law at issue is neither manifestly wrong nor is it mischievous. Rather,

18

this Court's loss-of-chance jurisprudence is consistent with Mississippi's pure comparative-negligence framework, and, for this reason, this Court declines to overturn Mississippi's longstanding causation standard.

## CONCLUSION

¶39.    The trial court, in its discretion, properly excluded Norman's experts and granted summary judgment in Anderson Regional's favor. We affirm the trial court's grant of summary judgment. We also decline to overturn Mississippi's longstanding loss-of-chance framework.

¶40.    **AFFIRMED.**

    **RANDOLPH, P.J., MAXWELL, BEAM AND ISHEE, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND COLEMAN, JJ. CHAMBERLIN, J., NOT PARTICIPATING.**

    **KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶41.    Because the plaintiffs offered sufficient evidence to avoid the exclusion of their experts at the summary judgment phase, I would reverse the circuit court's judgment and remand for further proceedings.

¶42.    As the majority correctly articulates, the loss-of-a-chance doctrine controls this appeal. Under that doctrine, the plaintiffs must show that, "but for the physician's negligence, [Charles Norman Sr.] had a reasonable probability of a substantial improvement. . . . Stated another way, the plaintiff[s] must offer proof of 'a greater than fifty (50) percent chance of

19

a better result than was in fact obtained.'" ***Mem'l Hosp. at Gulfport v. White***, 170 So. 3d 506, 508-509 (¶ 11) (Miss. 2015).

¶43. Dr. Harmut Uschmann, one of the plaintiffs' experts, provided deposition testimony that Norman, who had suffered a stroke, would have had a greater than 50 percent chance of improvement had he received timely administration of tPA—a clot-buster drug used to neutralize the effects of a stroke. Anderson Regional Medical Center disputed Dr. Uschmann's testimony, arguing that greater than 50 percent improvement chances could not be supported by the relevant medical literature. The Circuit Court of Lauderdale County agreed with the hospital, excluded the plaintiffs' medical experts, and granted summary judgment.

¶44. On appeal the plaintiffs argue, *inter alia*, that the circuit court erred by relying on statistics that set a higher standard than what is required under the loss-of-a-chance doctrine. As an example, the circuit court examined percentages of tPA efficacy in relation to a "favorable outcome" as defined by the NINDS study. According to that study, a "favorable outcome" means a "score of 95 or 100 on the Barthel index, [less than or equal to] 1 on the NIHSS and a modified Rankin Scale, and 1 on the Glasgow outcome scale." Under the Barthel index, a score of 100 applies to a patient who is completely independent, or, in other words, a patient who achieves a perfect result. The plaintiffs correctly assert that the loss-of-a-chance doctrine "does not require that a plaintiff prove a greater than fifty percent chance of *a perfect result or complete recovery*." The plaintiffs need only to show that Norman lost

20

"a greater than fifty (50) percent chance of a *better result* than was in fact obtained." ***White***, 170 So. 3d at 509 (¶ 11) (emphasis added).

¶45.    In light of the proper standard, the plaintiffs point to evidence contained in the record that supports the theory that Norman could have had a greater than 50 percent chance of a *better result*. For example, the Safe Implementation of Treatments in Stroke-International Stroke Thrombolysis Registry (SITS-ISTR) found that 58 percent of patients administered tPA in 3.0 to 4.5 hours after a stroke were functionally independent after three months. The hospital challenges the significance of these statistics, but that dispute is for resolution by a fact finder, not by this Court. ***Hill v. Mills***, 26 So. 3d 322, 330 (¶ 28) (Miss. 2010) ("[A] battle of the experts is to be decided by a jury.").

¶46.    In ***Cox v. St. Joseph's Hospital***, 71 So. 3d 795, 799 (Fla. 2011),[12] the Florida Supreme Court addressed the same issue raised in this case. After reviewing much of same medical literature that is before us, the ***Cox*** court determined that the tPA studies have created "conflicting evidence as to . . . causation or the likelihood of causation." ***Id.*** at 801. Specifically, the court acknowledged that "the significance of [the] statistics from the NINDS study . . . is a matter for the jury, not a matter for the appellate court to resolve as a matter of law." ***Id.*** As did the Florida Supreme Court, I find that the significance of the statistics from the tPA studies should be resolved by a fact finder rather than by a summary judgment order.

---

[12]Florida's loss-of-a-chance doctrine mirrors that of this Court, making ***Cox*** not only relevant but also persuasive.

¶47. Because I would afford relief to the plaintiffs under the current state of Mississippi law, I do not reach their request for a change in our loss-of-a-chance doctrine. Analysis of that argument is unnecessary for disposition of this case and, therefore, would amount to *obiter dicta* and an advisory opinion. "[T]his Court does not issue advisory opinions." ***Tallahatchie Gen. Hosp. v. Howe***, 49 So. 3d 86, 93 (¶ 19) (Miss. 2010).

¶48. The circuit court abused its discretion in excluding the plaintiffs' experts and erred in granting summary judgment. Further trial court proceedings are needed to resolve the issues in this case. I respectfully dissent.

**KING AND COLEMAN, JJ., JOIN THIS OPINION.**