# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00822-SCT

*EDWARD A. HYDE AND PATTIE HYDE*

*v.*

*LINUS BAXTER MARTIN, III, M.D. AND RUSH*
*MEDICAL FOUNDATION d/b/a RUSH*
*FOUNDATION HOSPITAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/2017 |
| TRIAL JUDGE: | HON. LESTER F. WILLIAMSON, JR. |
| TRIAL COURT ATTORNEYS: | WALTER C. MORRISON, IV |
| | WILLIAM T. MAY |
| | KACEY GUY BAILEY |
| | JAMES CORNELIUS GRIFFIN |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | WALTER C. MORRISON, IV |
| ATTORNEYS FOR APPELLEES: | KACEY GUY BAILEY |
| | WILLIAM T. MAY |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 01/31/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Edward and Pattie Hyde brought a medical-negligence case based on loss of chance. Their theory was that the treating physician's and hospital's failure to properly test for and timely diagnose Edward's stroke resulted in his not receiving treatment—namely, an injection of Tissue Plasminogen Activator, or "tPA," which they claim would have led to a better stroke recovery.

¶2.     The trial court dismissed this claim on summary judgment.  On appeal, the Hydes ask this Court to abandon our long-standing precedent on loss of chance.  They prefer we allow them to recover for the "reduced likelihood of a recovery."  But this Court has been clear "that Mississippi law does not permit recovery of damages because of mere diminishment of the 'chance of recovery.'"  *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985).  Instead, "[r]ecovery is allowed only when the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition."  *Id.*

¶3.     That said, we find the trial court erred in dismissing the Hydes' claim on summary judgment.  Consistent with our loss-of-chance standard, the Hydes presented expert medical testimony that the majority of stroke patients who timely receive tPA experience substantial improvement.  Because their expert supported his opinion with medical literature, we find the trial judge abused his discretion by excluding this testimony.

¶4.     The Hydes' expert testimony created a material fact dispute over whether the Hydes may recover for loss of chance.  We thus reverse the order granting summary judgment and remand the case to the trial court for further proceedings consistent with this opinion.

**Background Facts and Procedural History**

**I.      Edward's Stroke**

¶5.     In 2014, then fifty-three-year-old Edward went to the Rush Foundation Hospital emergency department with complaints of nausea, vomiting, and right-side numbness and weakness.  His wife Pattie claimed Edward also was having difficulty walking and falling

2

to one side. While Dr. Linus Baxter Martin III did not examine Edward personally, Dr. Martin supervised the nurse practitioner who did. The nurse practitioner ordered a CT scan, which according to the radiologist showed "[n]o acute intracranial abnormality." But the radiologist cautioned that if there was a high clinical concern for an acute stroke, then an MRI should be conducted. The nurse practitioner did not order an MRI. And Edward was discharged hours later with a diagnosis of gastroenteritis and hypertension.

¶6.     Twelve hours later, Edward returned to the hospital, unable to walk normally. This time the hospital admitted him for a neurological consultation. An MRI was ordered, which revealed Edward had suffered an ischemic stroke. At that point, Edward's treating physician, Dr. James Perkins, noted that administering the clot-buster drug tPA to restore blood flow to Edward's brain was no longer an option. The drug could not be administered because Edward had been experiencing stroke symptoms for more than sixteen hours.[1]

¶7.     Edward remained in the hospital for five days. He was then transferred to a rehabilitation facility for ten more days. He left the rehabilitation facility with permanent parenthesia of his right limbs and now cannot walk without a cane or walker.

## II.     The Hydes' Lawsuit

¶8.     Eight months after his stroke, the Hydes sued Dr. Martin and Rush Foundation Hospital. They asserted that Edward had presented to the emergency department with signs of a stroke, but the defendants negligently failed to perform a comprehensive neurological exam, failed to order an MRI and neurology consultation, and failed to administer

---

[1] TPA is usually most effective when administered within the first three hours after the onset of stroke symptoms.

anticoagulants.  Had the defendants conformed to the requisite standard of care, the Hydes claim Edward would not have suffered permanent injuries from his stroke.

¶9.    The Hydes designated Dr. Michael Stodard[2] and Dr. Hooman Kamal[3] as their medical experts.   Dr. Martin and the hospital moved to limit or exclude both Dr. Stodard's and Dr. Kamal's expert testimony.  They claimed the expert opinions were not reliable because the opinions were not supported by medical literature.  The defendants also moved for summary judgment on the premise the Hydes' expert testimony would be excluded.

¶10.    Following a hearing, the trial court granted Dr. Martin and the hospital's motion for summary judgment.  In its memorandum opinion, the court noted both Dr. Stodard and Dr. Kamal were qualified to testify to the standard of care and breach.  But their opinions on causation did not appear to comport with the medical literature.  Specifically, the trial court rejected Dr. Kamal's testimony, based on the Emberson study,[4] that the overall odds of a better outcome for patients who receive tPA is 75 percent better than those who did not receive tPA.  According to Dr. Kamal, "patients who receive tPA have a substantially better

---

[2] Dr. Stodard is board certified in family medicine and practiced emergency medicine for twenty-five years.

[3] Dr. Kamal is board certified in neurology and neurological care, with experience providing neurological consultations to emergency patients.  Since 2011, he has served as both an attending physician to the stroke service and a neurology professor at the New York Presbyterian Hospital/Weill Cornell Medical Center.

[4] Jonathan Emberson, *et al.*, *Effect of treatment delay, age, and stroke severity on the effects of intravenous thrombolysis with alteplase for acute ischaemic stroke: a metaanalysis of individual patient data from randomised trials*, 384 The Lancet 1929 (Nov. 29, 2014). This study examined the data from nine randomized trials that compared tPA versus a placebo or open control in 6,756 patients.

rate of neurological functioning than the patients" who did not receive the drug. When asked, Dr. Kamal was not able to name a study showing that tPA has an absolute benefit of more than 50 percent for a patient who is a candidate for tPA. Instead, he responded that those types of studies do not work in this type of case because there is a spectrum of disability, not 100 percent disability versus 0 percent disability.

¶11. The trial court found Dr. Kamal's testimony unsupported by the medical literature. Consequently, the judge found the Hydes had presented "no actual evidence that [Edward] would have a greater than 50% chance of a better result than was obtained[,] which is the standard under Mississippi negligence law." Thus, the court ruled there was no genuine issue of material fact about causation, entitling Dr. Martin and the hospital to a judgment as a matter of law.

### III. The Hydes' Appeal

¶12. The Hydes timely appealed, arguing the trial court erred in excluding their experts and granting Dr. Martin and the hospital summary judgment.

¶13. The Hydes filed their appeal on the heels of another appeal involving the factually similar claim that the failure to recognize a patient's stroke caused him to lose a chance of recovery. *See Norman v. Anderson*, 2017-CA-00153-SCT, 2019 WL 311292 (Miss. Jan. 24, 2019). In their appellate brief, the Hydes adopted the appellants' call in *Norman* for this Court to reevaluate its loss-of-chance approach set forth in *Clayton v. Thompson*, 475 So. 3d 439 (Miss. 1985), and *Ladner v. Campbell*, 515 So. 2d 882 (Miss. 1987). This Court

5

retained jurisdiction over both appeals to address the appellants' claim that we should change the law.[5]

## Standard of Review

¶14.    We review the trial court's decision to exclude the Hydes' experts' testimony for abuse of discretion. *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508 (Miss. 2015). But we review the court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the party against whom the summary-judgment motion has been made. *Miss. Baptist Med. Ctr., Inc. v. Phelps*, 254 So. 3d 843, 844-45 (Miss. 2018). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

## Discussion

¶15.    After review, we find the trial court erred in granting summary judgment to Dr. Martin and the hospital. In doing so, we emphasize that, in permitting the Hydes' tPA-based claim to go forward, we are not changing our law. Instead, we apply the same standard that we have consistently applied for thirty years: "Mississippi law does not permit recovery of damages because of mere diminishment of the 'chance of recovery.'" *Norman*, 2019 WL 311292, at *3 (quoting *Clayton*, 475 So. 2d at 445). Rather, "[r]ecovery is allowed only when the failure of the physician to render the required level of care results in the loss of a

---

[5] The Hydes also asserted their appeal involved an issue of first impression—whether in a tPA case a claimant can ever overcome the "50% threshold."

reasonable probability of substantial improvement of the plaintiff's condition." ***Clayton***, 475 So. 2d at 446. Our decision today should not be seen as relaxing, changing, or in any way altering this standard.

## I.    Mississippi's Loss-of-Chance Doctrine

¶16.    Echoing the same argument advanced in ***Norman***, the Hydes cast our approach to loss-of-chance claims as "all or nothing" and contrary to our law on comparative negligence. But we find our current law is neither.

¶17.    First, contrary to the law-journal articles and non-Mississippi caselaw the Hydes cite, our approach is not "all or nothing." It is balanced.

¶18.    In ***Clayton***, this Court "recognize[d] that the plaintiff is rarely able to prove to an absolute certainty what would have happened if early treatment, referral or surgery had happened." ***Id.*** at 445. So our "law does not require the plaintiff to show to a *certainty*" that treatment would have been 100 percent effective. ***Id.*** (emphasis in original) (citation omitted). But neither does our law permit recovery based on the mere possibility of a better outcome. *See **id.*** (holding that the jury-instruction's "good chance" of a "greater recovery" language "invited impermissible speculation and conjecture by the jury").

¶19.    Between certainty and mere possibility lies *reasonable probability*, which is exactly what our approach requires. As our precedent dictates, to recover under the loss-of-chance theory, "the plaintiff must prove that, but for the physician's negligence, he or she had a reasonable probability of a substantial improvement." ***White***, 170 So. 3d at 508 (citing ***Clayton***, 475 So. 2d at 445). "Stated another way, the plaintiff must offer proof of 'a greater

7

than fifty (50) percent chance of a better result than was in fact obtained.'" *Id.* at 509 (quoting *Hubbard v. Wansley*, 954 So. 2d 951, 964 (Miss. 2007)).

¶20. Second, our approach by no means creates an exception to the comparative-negligence doctrine. Under comparative negligence, the fact that the plaintiff's own negligence may have contributed to his injuries does not itself bar recovery. *See* Miss. Code Ann. § 11-7-15 (Rev. 2004). And this Court has never barred loss-of-chance-of-recovery claims based solely on the fact the patient may have negligently caused the injury or disease that led him to seek medical care in the first place.

¶21. Importantly, in this case, the alleged injury is not the stroke itself. Rather, it is the loss of the ability to recover from or halt the impact of the stroke based on the failure to timely administer tPA. Under our clear precedent, to recover damages, a plaintiff does not have "to prove to an absolute certainty" that administering tPA would have led to a full recovery. *Clayton*, 475 So. 2d at 445. But neither may a plaintiff recover damages merely based on the possible "chance" tPA may have led to a better outcome. *See id.* Instead, the plaintiff must show "the failure of the physician to render the required level of care result[ed] in the loss of a reasonable probability of substantial improvement of the plaintiff's condition." *Id.*

## II.  The Hydes' Medical Experts

¶22. With this standard in mind, we find the trial court abused its discretion when it excluded the Hydes' medical experts.

8

¶23. Dr. Kamal testified that Edward was a good candidate for receiving tPA.[6] And for patients who timely receive tPA, Dr. Kamal testified "the overall odds of their outcome are 75% better . . . than those who didn't" receive the drug. Unlike the medical expert in the tPA case *King v. Singing River Health System*, 158 So. 3d 318, 325-28 (Miss. Ct. App. 2014), who based his opinion solely on his own experience, which appeared to contradict the medical literature, Dr. Kamal supported his experience-based opinion with medical literature, specifically the Emberson study.[7] According to Dr. Kamal, the data from the Emberson study showed that, when one does not look for *perfect* recovery, "[t]he vast majority of those [patients who] get tPA see a substantial improvement in their symptoms."

¶24. Despite this, the trial court rejected Dr. Kamal's expert opinion as not being supported by the medical literature. The trial court asked Dr. Kamal to name a study showing that tPA has an absolute benefit of more than 50 percent for a patient who is a candidate for tPA. And because he could not, the trial judge concluded he had no medical literature to support his opinion. But unlike the plaintiff's expert in *Norman*—who, when pressed by this same trial court to name a study showing the absolute benefit of tPA exceeded 50 percent, *conceded* that none existed[8]—Dr. Kamal made no such concession. While Dr. Kamal did not challenge

_____

[6] We note this was not the case with the plaintiff's expert in *Norman*, who according to record in that case, conceded the patient was a "risky, risky" candidate for tPA and that it would not have been a breach of the standard of care to decide not to administer the drug within the critical window.

[7] *See* note 4, *supra*.

[8] *Norman*, 2019 WL 311292, at **4-5.

9

these studies as wrong,[9] he did explain why he believed these studies were not helpful—because those studies focused on perfect outcomes, i.e., 0 percent disability versus 100 percent disability. In Dr. Kamal's view, when one does not look for the percentage increase of perfect outcomes, but instead looks at the data on significant improvement, the medical literature does indeed support more than a 50 percent chance of substantial improvement when tPA is administered.

¶25. The "50% threshold," as the trial court dubbed our loss-of-chance standard, does not require a perfect result. Again, our law permits recovery based on a "reasonable probability of *substantial* improvement," which we have defined as "a greater than fifty (50) percent chance of a *better result* than was in fact obtained." **White**, 170 So. 3d at 508-09 (emphasis added). Thus, we find the trial court abused its discretion by applying to the Hydes' expert testimony a higher standard than our law requires. To the extent Dr. Martin and the hospital challenge Dr. Kamal's opinion on the reasonable probability that those who receive tPA substantially improve, we find this sets up a classic battle of the experts for the fact-finder to resolve, not a barrier to Dr. Kamal's testimony. *See **White***, at 509 (holding that the case "present[ed] nothing more than a classic example of a 'battle of the experts,'" with the plaintiff offering expert testimony that "supported a reasonable probability of a substantially better outcome," and the defendant offering "expert testimony that supported only a potential chance of a substantially better outcome").

---

[9] *See **King***, 158 So. 3d at 326 ("conclud[ing] that where a theory has been studied in the medical literature and an expert's opinion is challenged for being contrary to the medical literature, there must be some support in the medical literature for a medical expert's opinion or some basis for believing that the medical literature is wrong").

¶26.    Because Dr. Kamal sufficiently supported his expert opinion with medical literature, his testimony should not have been excluded.  Nor should have Dr. Stodard's, because his testimony focused on the alleged breach of the standard of care and what treatment options would have been available—including, but not limited to, administering tPA—had Mr. Hyde, in his view, been properly neurologically evaluated.

### III.    Trial Court's Grant of Summary Judgment

¶27.    For this reason, we reverse the trial court's grant of summary judgment in favor of Dr. Martin and the hospital.

¶28.    The elements essential to a medical-negligence claim are (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) a failure to conform to the required standard; and (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant. *White*, 170 So. 3d at 508.  "To prove these elements in a medical malpractice suit, expert testimony must be used, and the expert must articulate and identify the standard of care that was breached and establish that the breach was the proximate cause, or proximate contributing cause, of the alleged injuries."  *Id.* (citations omitted).  And, as already discussed, when the alleged injury is loss of chance, to satisfy the causation element, the plaintiff, through his expert, must prove, "but for the physician's negligence, he . . . had a reasonable probability of a substantial improvement."  *Id.*

¶29.    Through Dr. Stodard's and Dr. Kamal's expert testimony, the Hydes met their burden to produce evidence establishing a fact question on each element of their loss-of-chance

11

claim—including causation.  *See **Karpinsky v. Am. Nat. Ins. Co.***, 109 So. 3d 84, 89 (Miss.

2013).  Thus, summary judgment under Mississippi Rule of Civil Procedure 56(c) should not

have been granted to the defendants.  We reverse the trial court's judgment and remand the

case to the trial court for further proceedings consistent with this opinion.

¶30.    **REVERSED AND REMANDED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, BEAM AND ISHEE, JJ., CONCUR.  KITCHENS, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.  CHAMBERLIN, J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶31.    I agree with the majority to the extent that the circuit court abused its discretion in

excluding the Hydes' experts and, as a result, erred in granting summary judgment in favor

of Dr. Martin and the hospital. However, I would not reach the Hydes' request to modify our

loss-of-a-chance doctrine.[10] The Court grants relief to the Hydes under existing Mississippi

law, and I would limit our discussion to that issue. Therefore, I concur in result only.[11]

**KING, J., JOINS THIS OPINION.**

---

[10]I raised this similar point in my dissent in ***Norman v. Anderson***, 2017-CA-00153-SCT (Miss. Jan. 24, 2019).

[11]*See, e.g.*, ***Frierson v. State***, 606 So. 2d 604, 608 (Miss. 1992) (Banks, J., concurring in result only) ("I concur in the result reached by the majority . . . . Because[] I disagree with some of the conclusions expressed in the balance of the majority opinion and because, in my view, the discussion of those issues is unnecessary to the disposition of the case, I write separately to note that concurrence.").