# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-01255-SCT

*JOHN RENNER*

*v.*

*RETZER RESOURCES, INC. AND VELENCIA HUBBARD, INDIVIDUALLY AND IN HER CAPACITY AS MANAGER OF MCDONALD'S*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2016 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| TRIAL COURT ATTORNEYS: | ROBERT F. STACY, JR. |
| | ROBERT ALLEN SMITH, JR. |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID NEIL McCARTY |
| | ROBERT ALLEN SMITH, JR. |
| ATTORNEY FOR APPELLEE: | ROBERT F. STACY, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 12/07/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., COLEMAN AND MAXWELL, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The instant case arises from a trip-and-fall at a McDonald's restaurant in Winona, Mississippi. The circuit court granted summary judgment in favor of defendants. The plaintiff appeals, arguing that summary judgment was not proper because (1) he established each element of a premises-liability claim, and (2) the defendants lost or destroyed key video evidence, which he argues forecloses the grant of summary judgment. The plaintiff has

established several triable issues of fact. Accordingly, summary judgment was inappropriate, and the Court reverses and remands.

## FACTS AND PROCEDURAL HISTORY

¶2. According to the plaintiff, on August 13, 2012, seventy-six-year-old John Renner ("Renner") was traveling from Jackson, Mississippi, to his home in St. Louis, Missouri. He, his wife, and two other family members stopped at a McDonald's in Winona around 9:30 a.m. After he received his order, Renner set his food down at a table and walked to the condiment station. Renner picked up some condiments. Before returning to his table, he thought one of the McDonald's employees spoke to him. Renner turned and faced the counter before realizing the employee was speaking to another customer. As Renner turned back around to return to his table, his left foot struck a protruding leg of a highchair, causing him to fall and suffer injury to his face and left shoulder. After the fall, Renner heard one of the McDonald's employees ask another what the highchair was doing there, and to move it.

¶3. Two and a half years later, Renner filed suit against McDonald's; Retzer Resources, Inc., the owner and operator of the Winona McDonald's; and Velencia Hubbard, the manager of the Winona McDonald's. During discovery, the defendants claimed that video footage of the fall no longer existed.

¶4. The defendants, Hubbard and Retzer, moved for summary judgment, arguing that Renner could not demonstrate the existence of any genuine issue of material fact that: (1) the highchair was a dangerous condition; (2) any alleged danger was hidden; or (3) defendants

2

had actual or constructive knowledge of the alleged dangerous condition. Attached to the defendants' motion and the plaintiff's response were the depositions of Greta Siegel, John Renner, Renner's wife Sherlyn, Velencia Hubbard, and Hugh Ballard, an Information Technology (IT) employee of Retzer Resources.

¶5.     Greta Siegel was an eyewitness to the fall. Siegel, originally from Winona and a former Dean of Students at a college in California, was a frequent patron of the Winona McDonald's. Siegel visited McDonald's often in order to use its Wi-Fi connection. On the morning of the fall, Siegel was seated in a booth catty-corner to the location of the accident. Siegel's attention was directed that way when she heard a loud noise. She saw Renner fall and land on the floor. She also saw Renner's left foot tangled in the leg of a highchair. Siegel then heard a McDonald's employee immediately instruct other McDonald's employees to move the highchairs away from that area.

¶6.     Siegel testified that she was not surprised that Renner had tripped at the condiment station, because the highchairs are obscured from view behind a "half wall," and because the legs of the highchairs protrude out farther than the tops of the highchairs. When questioned about the visibility of the highchairs, Siegel testified that, "[w]hat is hidden is the way that bottom juts out, because as you walk up to the chairs, obviously, they are there, but what you wouldn't expect is for a . . . piece of it to be sticking out." When asked about the particular morning of Renner's fall and whether the highchairs were sticking out into the aisle, Siegel confirmed that they were and described the placement of the chairs as a "big hazard."

3

¶7.     Siegel previously had seen other McDonald's customers bump into the highchairs at the same location where Renner fell. Siegel testified that she had seen approximately three customers stumble against the chairs and had seen other customers accidently kick the chairs. She described the customers' reactions to the chairs as being confused about what they had kicked, "because the top seems to be what you would hit first . . . [b]ut with that bottom sticking out, it is something that people hit and they don't realize what they are kicking."

¶8.     Siegel had complained several times about the location of the highchairs to a manager and to other McDonald's employees prior to this accident. Siegel testified that after complaining about the chairs, the employees would move them away from the corner, but still leave them on the same wall.  However, Siegel also testified that, since the accident, the chairs remain in the same location.

¶9.     Velencia Hubbard, the shift manager of McDonald's at the time of the accident, did not dispute any of Siegel's testimony.  She opined that she thought the chairs were properly stored and did not believe they were out of place. Throughout her deposition testimony, Hubbard testified the she did not know or did not remember key facts.  For example, Hubbard testified that she was not sure whether the legs of the highchairs protruded into the aisle at the time of the accident.  Hubbard testified that she saw Renner fall and saw that his feet were caught in the highchair.  She remembered speaking with the Renners, completing an incident report, and calling the insurance company, which was standard procedure after a slip and fall. Valencia testified that the placement of the chairs did not change after Renner's fall, and that they always remained in the same location. Valencia also testified that

4

there was a video recording of Renner's fall, though she could not remember if she had ever seen it.

¶10.   Sherlyn and Renner both provided affidavits relating events after the accident. Sherlyn and Renner testified that, two days after the fall, a risk management company for McDonald's called to check on Renner's condition.  Sherlyn spoke with a woman from the company, who told Sherlyn that McDonald's had provided them with videotapes of the incident and that they would review the tapes to see what happened.  Renner testified that about four to five weeks later, he called an "800 number" on a McDonald's incident form that he was provided.  Renner spoke with a representative who told him that security tapes would have to be reviewed before they could speak about the accident with Renner.  Another four to five weeks later, Renner called again. He was told the tapes had still not been reviewed.  No video footage was produced per requests in discovery.

¶11.   Hugh Ballard, the IT employee in charge of video surveillance at the Winona McDonald's, testified that a video camera faces the location where Renner fell.  The video camera is motion-activated and does not record constantly. Ballard testified that the recordings are kept temporarily on a computer hard drive for approximately sixty-three to sixty-four days, depending on how quickly the hard drive fills up.  The recordings are then recorded over.  Ballard testified that he received a request from another Retzer Resources employee on October 17, 2013—sixty-five days after the accident—to preserve the video footage of Renner's fall. Ballard testified that he "imagined" that he tried to retrieve the footage, though he could not remember. Ballard testified that the video was gone. He had no

5

way of knowing whether the footage was recorded over or whether it ever existed, although there was no indication that the camera was not operational on the day of Renner's fall.

¶12.    Renner responded to the defendant's motion for summary judgment, arguing that the testimony of each of the five witnesses established that McDonald's was either directly negligent in causing his fall, or McDonald's had actual or constructive knowledge of the alleged dangerous condition.  Further, Renner argued that, because of the unfavorable presumption that attaches to evidence spoliation, summary judgment would be inappropriate.

¶13.    On August 2, 2016, the trial court issued its opinion and final judgment granting summary judgment in favor of the defendants, Hubbard and Retzer.  The trial court found that Renner was an invitee of McDonald's, and therefore, McDonald's owed a duty to keep the premises reasonably safe and to warn only when there was hidden danger, not in plain and open view.  The trial court found that "[t]he presence of a high chair in a restaurant like McDonald's is clearly a 'normal' and 'usual' condition that an invitee could 'expect to encounter.'  Therefore, McDonald's cannot be held liable for Mr. Renner's injuries in this case."  The trial court found that Renner had failed to produce any evidence that any McDonald's employee had placed the high chair in Renner's path or had any actual or constructive knowledge that the highchair posed a danger to Renner.  The trial court's opinion made no reference to the missing video evidence. Renner timely appealed and raises two issues: (1) whether summary judgment was granted erroneously because Renner had proved each element of his premises-liability claim, and (2) whether the defendants' loss or destruction of key video evidence prohibited the grant of summary judgment.

6

## DISCUSSION

¶14. "Summary judgment shall be rendered if the 'pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Miss. R. Civ. P. 56(c). "Summary judgment 'is appropriate when the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."'" *Karpinsky v. American Nat'l Ins. Co.*, 109 So. 3d 84, 88 (Miss. 2013) (citing *Buckel v. Chaney*, 47 So. 3d 148, 153 (Miss. 2010). We review the grant of summary judgment de novo and will view evidence "in the light most favorable to the party against whom the motion has been made." *Id.* (citing *Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 71 (Miss. 2012)).

### I. Premises-Liability Claim

¶15. Renner argues that the trial court erred in granting summary judgment because he proved each element of his premises-liability claim. The parties do not dispute that Renner was an invitee of McDonald's. "A landowner owes an invitee the duty 'to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not in plain and open view." *Mayfield v. The Hairbender*, 903 So. 2d 733, 737 (Miss. 2005) (citations omitted). To recover in a trip-and-fall case, a plaintiff must "(1) show that some negligent act of the defendant caused his injury; or (2) show that the defendant had actual knowledge of a dangerous condition and failed to warn the plaintiff; or (3) show that

the dangerous condition existed for a sufficient amount of time to impute constructive knowledge to the defendant, in that the defendant should have known of the dangerous condition." *Anderson v. B.H. Acquisition, Inc.*, 771 So. 2d 914, 918 (Miss. 2000) (citing *Downs v. Choo*, 656 So. 2d 84, 86 (Miss. 1995)).

¶16.    Renner established sufficient facts, which, if believed, would defeat a motion for summary judgment. It would be a question for the finder of fact whether the defendants had actual knowledge of the alleged dangerous condition and failed to warn Renner, or whether the defendants had constructive knowledge of the alleged dangerous condition (another issue for a jury). Renner offered the deposition testimony of Siegel, who testified that the legs of the highchairs protrude into the aisle and are obscured from view behind a "half wall." Siegel claimed personally to have witnessed at least three customers bump into or kick the highchairs. Siegel testified that she repeatedly had alerted several McDonald's employees about her concerns regarding the alleged hidden nature and dangerous condition of the highchairs. This testimony regarding McDonald's knowledge was undisputed by Valencia Hubbard or any other witness.

¶17.    The defendants take issue with Siegel's testimony and affidavit, arguing that she offered inadmissible opinions. Mississippi Rule of Evidence 701 sets forth the rules regarding lay witness opinion: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope

of Rule 702," which sets forth the rules for expert testimony. The Advisory Committee Note to the rule states that Rule 701 *favors* the admission of lay opinion when the opinion is based on first-hand knowledge or observation, and when the opinion is helpful in resolving the issues. The defendants' argument is without merit. Siegel's testimony and affidavit are based wholly on her own observations, and they certainly are helpful in deciding the issues of Renner's premises-liability claim.

¶18. The defendants also argue that Siegel offered inadmissable expert testimony because she opined that the highchair's design constituted a hazard. This argument is without merit. Siegel simply testified that the she physically saw that the legs of the highchairs protruded into the aisle and that several customers had bumped into or kicked the highchairs. She stated that, in her opinion, the highchairs were a "big hazard" because they were obscured behind a "half wall," and the legs jutted out farther than the tops of the highchairs. Siegel did not offer a scientific or technical opinion as to the highchair's design, but rather testified about her observations of the highchairs based on the many hours she has spent patronizing the Winona McDonald's.

¶19. The trial court's opinion fails to account for the testimony of Siegel and concluded that, because highchairs normally are present in restaurants, an invitee could expect to encounter them. The trial judge's opinion erroneously supplanted the facts in the record with his own opinion regarding the location of the highchairs. This is a role for jurors. *See Prescott v. Leaf River Forest Prods., Inc*., 740 So. 2d 301, 309 (Miss. 1999) ("The trial

court's function on a Rule 56 motion for summary judgment is not to resolve disputed factual issues, but rather to determine whether issues of fact exist to be tried.")

¶20.   At the very least, genuine issues of material fact remain for trial.  Siegel testified that she did not know of any person moving the highchairs at any time before the fall.  Hubbard testified that she could not remember whether the highchairs had been moved. Further, Hubbard testified that Renner was walking from the counter with a tray in his hands, while the Renners and Siegel all testified that Renner did not have a tray, and that he was walking from the condiment station to the dining area.  The number of highchairs stored behind the "half wall" also is in dispute, as Hubbard testified that there were only two, while Siegel testified that there were five or six.

¶21.   "The moving party has the burden of demonstrating that [no] genuine issue of material fact[s] exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." *Duckworth v. Warren*, 10 So. 3d 433, 437 (Miss. 2009) (quoting *One South, Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (Miss. 2007)) (citation omitted).  Renner produced sufficient testimonial evidence establishing that genuine issues of material fact exist, and Renner should be given the benefit of *every reasonable doubt*. *Ladnier v. Hester*, 98 So. 3d 1025, 1028 (Miss. 2012) (citation omitted) (emphasis added).  In any case "[w]here doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits." *Prescott*, 740 So. 2d at 309.  It was error for the trial court to grant summary judgment in favor of the defendants because triable issues of fact remain.

## II. Spoliation of Video Evidence

¶22.   Renner argues that the defendants' loss or destruction of video evidence forbids summary judgment.  An examination of the record reveals that this issue has not been fully developed in discovery.  The facts, as they are available now, indicate only that the IT employee claims no video of the fall exists.  Whether the risk management company has or had the video is in dispute.  If further discovery indicates that spoliation occurred, the trial court should approve a spoliation jury instruction, if appropriate.  *See Copeland v. City of Jackson*, 548 So. 2d 970, 973 (Miss. 1989) ("[J]ury instructions should only be granted where there is evidence presented to support the giving of those instructions.")

¶23.   This Court has held that where there is proof of spoliation, the nonoffending party is entitled to a "spoliation inference." *Dowdle Butane Gas Co., Inc. v. Moore*, 831 So. 2d 1124, 1127 (Miss. 2002) (citing *Bott v. Wood*, 56 Miss. 136 (1878)). "The inference entitles the non-offending party to an instruction that the jury may infer that spoliated evidence is unfavorable to the offending party." *Id.* (citing *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818, 822 (Miss. 1992)).  In other words, the jury is not *required* to draw an adverse inference that the evidence would have been unfavorable, but the innocent party is entitled to an instruction *permitting* the jury to draw a negative inference from spoliated evidence. *See Krosnich v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998). To prove that spoliation occurred, the innocent litigant is not required to show fraudulent intent on the part of the spoliator. *Thomas v. Isle of Capri Casino*, 781 So. 2d 125, 133 (Miss. 2001).  Even where evidence is unavailable due to negligence, an inference arises that the evidence would have been

unfavorable, and the jury should be so instructed. *Id.* (citation omitted). Accordingly, if the evidence reveals that the video was lost intentionally or negligently, Renner is entitled to a spoliation jury instruction.

## CONCLUSION

¶24. The trial court erroneously granted summary judgment because triable issues of fact remain. The Court reverses the judgment of the Washington County Circuit Court and remands for proceedings consistent with this opinion.

¶25. **REVERSED AND REMANDED**.

**WALLER, C.J., KITCHENS, P.J., KING, COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**