# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00910-COA

JESSICA HAYES, INDIVIDUALLY AND AS                 APPELLANTS
WRONGFUL DEATH BENEFICIARY OF
LANCE HAYES, DECEASED, AND ON BEHALF
OF ALL WRONGFUL DEATH BENEFICIARIES
OF LANCE HAYES, DECEASED; LANDON
HAYES, ADDYSON HAYES, AND PAYTON
HAYES, A MINOR, BY AND THROUGH HER
GUARDIAN AND MOTHER, JESSICA HAYES

v.

MAGEE BENEVOLENT FOUNDATION D/B/A            APPELLEES
MAGEE GENERAL HOSPITAL AND WILLIAM
JASON BASS, NP

| | |
|---|---|
| DATE OF JUDGMENT: | 08/05/2024 |
| TRIAL JUDGE: | HON. MATTHEW GORDON SULLIVAN |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | LANCE L. STEVENS |
| ATTORNEYS FOR APPELLEES: | W. DAVIS FRYE |
| | NICOLE ALISE BROUSSARD |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 02/03/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Lance Hayes went to the emergency room at Magee General Hospital (MGH) and stated that he thought he was having a panic attack similar to one that had caused him to seek treatment at another hospital six months earlier. A nurse practitioner diagnosed Lance with a panic attack, prescribed Ativan, and discharged him without consulting a physician. Lance died of an apparent myocardial infarction (a heart attack) shortly after he returned home.

¶2.     Lance's wife, Jessica, sued MGH and the nurse practitioner,[1] alleging that MGH breached the standard of care and proximately caused Lance's death by failing to perform a full cardiac workup and properly diagnose Lance before discharging him.   MGH subsequently filed a motion for summary judgment, arguing that Jessica could not establish causation under Mississippi's "loss-of-chance doctrine."  The circuit court granted MGH's motion.  For the reasons explained below, we conclude that there are genuine issues of material fact.  Therefore, we reverse the order granting summary judgment and remand the case for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶3.     Around 5 a.m. on March 30, 2021, Lance Hayes woke his wife, Jessica, and told her that "something[ was] not right."   Lance was short of breath, having chest pains, and sweating profusely ("just dripping").  Lance said his symptoms "maybe, possibly" felt like what he experienced six months earlier when he had gone to the emergency room at St. Dominic Hospital in Jackson.[2]  Jessica, a licensed practical nurse, insisted that Lance go to the emergency room.  Jessica drove Lance to MGH but could not go inside with him due to the hospital's COVID-19 protocols.

---

[1] For ease of reference, we refer to MGH and the defendant nurse practitioner collectively as "MGH."

[2] In September 2020, Lance went to St. Dominic complaining of shortness of breath and chest pains.  He was diagnosed with anxiety and admitted overnight for observation. A consulting cardiologist evaluated Lance and ordered an EKG, PET scan, serial cardiac enzyme testing, a lipid panel, a liver function panel, and a troponin test.  St. Dominic determined Lance had negative serial cardiac enzymes and a normal PET scan and recommended he follow up with his primary care physician for a sleep study.

¶4.    MGH records show that Lance was admitted at 5:42 a.m. complaining of an "anxiety attack."  The records show that Lance stated that his symptoms felt "exactly" like an anxiety attack or panic attack he had experienced six months earlier.  Lance told hospital staff that he had been given a shot and prescribed Lexapro for his previous anxiety attack, "which had helped," but he had "slacked" and was no longer taking Lexapro as prescribed.  A nurse took Lance's vitals, and nurse practitioner Jason Bass prescribed 2 mg of Ativan for Lance's anxiety.  No doctor was present in the emergency room or consulted.

¶5.    MGH records show that the Ativan was "effective" and that Lance experienced "no reaction."  The records show that by 6:25 a.m., Lance said he felt "better and [was] ready to go home," and a decision was made to discharge him.

¶6.    While she was waiting outside, Jessica sent Lance text messages asking if they had "put [him] on a heart monitor" and urging him, "Please make sure they check your heart."  Lance told Jessica that they had checked his heart, and Jessica asked whether they had done an "EKG" or were using a "continuous monitor."  Lance sent Jessica a photograph of a monitor in his room, but Jessica told him that the monitor was not a "hear[t] monitor" and only measured his "oxygen and heart rate."  Lance then called Jessica and told her she could come meet him.  Jessica testified that when she entered the hospital, she heard Lance telling a nurse (Eli Duran), "I still feel chest discomfort and short of breath, and if you send me home like I am right now, I feel like I'll be back here later."  Duran went to get Bass.  Lance told Bass that he was "still hurting" and felt like he would "be back later" if he was discharged.  Jessica asked Bass if Lance could at least remain at the hospital while she took

3

her daughter to school. Bass said that he did not mind, although he was "about to leave and be off duty." As it turns out, Bass was nearing the end of a twenty-four-hour shift (7 a.m. to 7 a.m.) in the emergency room. Jessica left the hospital around 7 a.m.

¶7. Jessica took her daughter to school and then returned to the hospital. She testified that Lance had already been discharged and met her outside. MGH records state that the staff reviewed Lance's discharge instructions with Jessica, but Jessica denied this. She testified that when she asked Lance how he was feeling, Lance said, "I'm a little better; I still -- I'm not myself, but, hopefully, I can rest." Lance was still taking "slow deep breaths" as though he was "trying to get enough air to make him feel like he had enough air." MGH records show that Lance was discharged at 7:49 a.m. When Jessica dropped him off at home at around 7:52 a.m.,[3] Lance was still sweating and was "wet and clammy." Lance said he would go in the house, lie down, and try to stay cool.

¶8. Jessica called Lance after she clocked in at work. He told her he had decided to lie down in their bedroom with the fan and air conditioner on to try to cool off and get some rest. Jessica testified that during that call, Lance was still complaining that he was hot and sweating. Around 10:15 or 10:20 a.m., Jessica called Lance's cell phone again, but he did not answer. She then called their son, Landon, to check on Lance. Landon told Jessica that Lance was unresponsive and not breathing, and Jessica hurried home. She found Lance not breathing, without a pulse, and "already somewhat cool." She attempted chest compressions in an effort to resuscitate him, but she stopped because "it was very evident that he was

---

[3] Jessica testified that her house is "literally two minutes from the ER," and she had to be at work at 8 a.m.

4

gone." Lance's death certificate, completed by the deputy county coroner, listed the immediate cause of death as cardiac arrest with underlying causes of myocardial infarction, hypertension, and anxiety. No autopsy was performed.

¶9. At 1:59 p.m., hours after Lance had died, nurse Elizabeth Warren amended MGH's records to state that Lance "had no complaint prior to being discharged" and was "smiling and thanking staff as he was walking out of the facility." Warren initially testified that she did not know that Hayes had died when she added the note. However, after reviewing text messages between her and Eli Duran, the ER triage nurse who treated Lance, Warren admitted that she and Duran knew that Lance had died and discussed his death before she added certain notations to his records.

¶10. Jessica sued MGH and Bass for wrongful death, alleging that their negligence caused Lance's death. The complaint alleged that MGH failed to act in a manner consistent with the minimum standard of care for a medical facility or provider by failing to obtain an adequate medical history, perform necessary tests, and appropriately diagnose and treat Lance's condition, symptoms, and imminent risk of death, thereby proximately causing his death. Jessica designated an expert, Dr. Wesley Blake Vanderlan, who opined that MGH breached the standard of care by failing to perform a full cardiac workup and rule out any cardiac issue and by uncritically accepting Lance's self-diagnosis of a panic attack.

¶11. Following discovery, MGH moved for summary judgment, arguing that Jessica could not establish "causation" under Mississippi law because Jessica could not show (1) that Lance died of a myocardial infarction or (2) that if MGH had "performed a cardiac workup,"

he would have received treatment that "more likely than not [would] have prevented death." In response, Jessica submitted Dr. Vanderlan's affidavit and deposition testimony and argued that Dr. Vanderlan's opinions met her burden of production and established genuine issues of material fact precluding summary judgment. In rebuttal, MGH argued that Dr. Vanderlan's affidavit was insufficient because it provided opinions that were both beyond the scope of his original deposition and contrary to his deposition testimony.[4] At the conclusion of the hearing on MGH's motion for summary judgment, the circuit judge stated that he was "sustaining [the] motion." In a subsequent written order, the court stated, without elaboration, that MGH's motion was "well taken and should be granted" and dismissed the case with prejudice. Jessica filed a notice of appeal.

**ANALYSIS**

¶12. We review an order granting summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). Summary judgment "shall" be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The non-moving party "may not rest upon the mere allegations or denials of his pleadings," but must respond with competent evidence of "specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). "The movant bears the burden of *persuading* the [court] that: (1) no genuine issue of material fact

---

[4] MGH filed a separate motion to strike Dr. Vanderlan's allegedly new and untimely disclosed opinions; however, MGH never noticed that motion for a hearing.

6

exists, and (2) on the basis of the facts established, he is entitled to judgment as a matter of law." *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990). The non-moving party "should be given the benefit of every reasonable doubt," and "[i]n any case where doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits." *Renner v. Retzer Res. Inc.*, 236 So. 3d 810, 815 (¶21) (Miss. 2017) (brackets and quotation marks omitted). "Summary judgment should only be granted when the moving party has met its burden by demonstrating that no genuine issues of material fact exist." *United Emergency Servs. of Miss. Inc. v. Miller ex rel. Reed*, 414 So. 3d 66, 71 (¶9) (Miss. 2025) (citations and quotation marks omitted).

¶13. "To establish a prima facie case of medical malpractice under Mississippi law, a plaintiff must prove by a preponderance of the evidence (1) the applicable standard of care; (2) a failure to conform to the required standard; and (3) an injury proximately caused by a defendant's noncompliance with the standard." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 523 (¶12) (Miss. 2019). "The nonmoving party generally must establish medical negligence through expert testimony. Not only must this expert identify and articulate the requisite standard that was not complied with, [but] the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *United Emergency Servs.*, 414 So. 3d at 71 (¶9) (citations and quotation marks omitted).

¶14. Regarding causation, "[the Mississippi Supreme] Court recognizes that the plaintiff is rarely able to prove to an absolute certainty what would have happened if early treatment,

7

referral or surgery had happened." *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985). Accordingly, "[t]he law does not require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly. Having in mind this reality, our approach to the requirement of causation in medical malpractice cases necessarily differs from that employed in most other tort contexts." *Id.* (citation, ellipsis, and quotation marks omitted). In a medical malpractice case, "to recover under the loss-of-chance theory, the plaintiff must prove that, but for the [provider's] negligence, he or she had a reasonable probability of a substantial improvement"—that is, "the plaintiff must offer proof of a greater than fifty (50) percent chance of a better result than was in fact obtained." *Hyde v. Martin*, 264 So. 3d 730, 734-35 (¶19) (Miss. 2019). "Causation is generally a matter for the jury." *United Emergency Servs.*, 414 So. 3d at 71 (¶9) (brackets and quotation marks omitted).

¶15.   Here, Jessica relied on the affidavit and deposition testimony of Dr. Vanderlan, a licensed physician who was board certified in general surgery and critical care. Dr. Vanderlan has worked in emergency rooms as an emergency room physician and an "on call" physician in general and trauma surgery. Dr. Vanderlan stated that because "a 'panic attack' and an adverse cardiac event" have similar symptoms, "the standard of care requires that an emergency room care provider obtain a complete historical account of the patient's cardiac history and rule out any cardiac . . . causes" for what may "otherwise appear[] to be a 'panic attack.'" Moreover, Dr. Vanderlan noted that MGH's own policies stated that when treating an apparent "panic attack," a provider must "mak[e] sure there is nothing seriously wrong with the heart." Dr. Vanderlan stated that for a patient presenting with Lance's symptoms

8

and medical history, the standard of care and the hospital's own policies required the provider to monitor the patient's heart activity using a "full, 12 lead EKG." Dr. Vanderlan noted that the hospital failed to do so in this case despite the fact that a simple or less detailed "one-lead EKG" showed an abnormal, elevated heart rate. Dr. Vanderlan further stated that the standard of care and the hospital's own policies required a "battery" of diagnostic tests when a patient presented with Lance's history and symptoms, including shortness of breath and chest pains. The hospital's own protocols also provided that a patient over the age of thirty with risk factors should receive a 324 mg chewable aspirin within ten minutes of arrival. Dr. Vanderlan opined that Bass deviated from and completely failed to follow the standard of care and the hospital's own protocols. Dr. Vanderlan also opined that the standard of care required a nurse practitioner such as Bass to consult a physician when treating a patient presenting with Lance's symptoms.

¶16. Dr. Vanderlan also noted that MGH appeared to maintain that it had provided appropriate treatment because Lance's heart rate slowed to "below tachycardic levels after the administration of Ativan." Dr. Vanderlan stated that this contention was "baffling and scientifically flawed" because Ativan merely treated a symptom (elevated heart rate) without identifying or addressing the underlying condition. Dr. Vanderlan emphasized that MGH breached the standard of care because it failed to properly diagnose Lance's condition and failed to rule out cardiac issues before simply diagnosing Lance with a "panic attack and releasing [him] from medical care."

¶17. Dr. Vanderlan contrasted the care Lance received at MGH with the care he received

9

when he visited St. Dominic with similar symptoms and complaints six months earlier. *See supra* ¶3 & n.2. The triage personnel at St. Dominic properly and carefully inquired about Lance's symptoms, medical history, prescriptions, and risk factors and expressed concern about Lance's "numerous cardiac risk factors." Although St. Dominic personnel preliminarily diagnosed a panic attack, they nonetheless consulted a cardiologist and thoroughly tested Lance for cardiac issues, including performing a full EKG, a chest x-ray, and other tests. In addition, even though Lance's heart rate and blood pressure were lower when he presented to St. Dominic than when he presented to MGH six months later, St. Dominic admitted Lance overnight for observation. And even though Lance's initial tests at St. Dominic appeared "essentially normal," St. Dominic still referred him to a cardiologist the next day. Dr. Vanderlan opined that St. Dominic had provided the "textbook standard of care" and "illustrate[d] the disastrous failure at MGH" six months later.

¶18. Dr. Vanderlan also concluded, to a reasonable degree of medical certainty, that Lance's death certificate correctly identified the cause of death as a myocardial infarction. Dr. Vanderlan stated that although an autopsy would have "provide[d] greater clarity," a series of "documented historical factors" indicated that a myocardial infarction was "more probable . . . than any other alternative" cause of death. Dr. Vanderlan noted that Lance had a number of risk factors for a heart attack: he was a morbidly obese African American male; he had a long history of smoking; he had a history of high blood pressure and high cholesterol, both of which required daily prescription medication; and he had a history of anxiety requiring prescription medication. "Without question," Lance "presented a high risk

10

profile for heart issues." In addition, Lance's symptoms prior to his death were "consistent with an impe[n]ding cardiac event," including shortness of breath, tachycardia, high blood pressure, feelings of anxiety, and profuse sweating. Dr. Vanderlan stated that he "ha[d] signed many, many death certificates stating the primary, secondary and tertiary cause of death" and that such determinations were "well within [his] area of expertise."

¶19. In his deposition, Dr. Vanderlan testified that patients who present to a hospital and are diagnosed and treated "before they have [a myocardial infarction]" have a survival rate of "greater than 75 percent" and a mortality rate of "less than 25 percent" because they are treated before they experience "cardiac damage." Therefore, Dr. Vanderlan opined that Lance would have had a greater than seventy-five-percent chance of survival if MGH had diagnosed his cardiac condition and treated him appropriately. In his affidavit, Dr. Vanderlan added that "even giving such a patient one 324 mg chewable aspirin reduces the risk of death by [acute myocardial infarction] by 50%. They [(i.e., MGH)] did not even do that." As noted above, Dr. Vanderlan noted that MGH's own policies provided that a patient over the age of thirty with cardiac risk factors who complains of chest pain should be given a 324 mg chewable aspirin.

¶20. In its appellate brief, MGH argues that Dr. Vanderlan's testimony and affidavit fail to establish causation on a "loss-of-chance theory" because (1) Dr. Vanderlan "improperly assumes that [Lance] died of a myocardial infarction" and his "cause of death opinion is speculative and unreliable"; (2) Dr. Vanderlan's statement that "one 324 mg chewable aspirin reduces the risk of death by [acute myocardial infarction] by 50%" "fails to establish

11

causation" "on its face"; (3) Dr. Vanderlan's deposition testimony fails to establish causation; and (4) Dr. Vanderlan's affidavit included opinions that were not timely disclosed and that clearly contradict his prior sworn testimony. We address these arguments in turn.

¶21. Regarding the first point, MGH emphasizes that in Dr. Vanderlan's deposition, he testified that "if you want to *definitively*" determine whether someone died of a myocardial infarction, then "you go to an autopsy and examine the coronary vessels and . . . the heart and see what happened." (Emphasis added). When asked if there was "any other way to *definitively* know that without an autopsy," Dr. Vanderlan said he would "defer that [question] to a pathologist." (Emphasis added). In his subsequent affidavit, Dr. Vanderlan acknowledged that an autopsy would have "provide[d] greater clarity," but he still opined "to a reasonable degree of medical certainty" that Lance "died of a myocardial infarction." Dr. Vanderlan explained that his opinion was based on Lance's documented risk factors for a myocardial infarction and Lance's symptoms upon arrival at MGH.

¶22. Although MGH argues that Dr. Vanderlan's affidavit "is in direct contradiction" with his prior deposition testimony, we disagree. In his deposition, Dr. Vanderlan simply acknowledged that he could not "definitively" determine Lance's cause of death because no autopsy was performed. This does not contradict Dr. Vanderlan's subsequent affidavit opining "to a reasonable degree of medical certainty" that Lance died of a myocardial infarction. "[The Mississippi] Supreme Court does not require that expert testimony *conclusively* establish the cause of death." *Mariner Health Care Inc. v. Est. of Edwards ex rel. Turner*, 964 So. 2d 1138, 1144 (¶8) (Miss. 2007) (emphasis added). Rather, "[t]he expert

opinion of a doctor as to causation must be expressed *in terms of medical probabilities as opposed to possibilities.*" *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1202 (¶20) (Miss. 2012) (emphasis added). Here, Dr. Vanderlan's opinion that Lance died of a myocardial infarction is not conclusory; it is based on sufficient facts and data (Lance's documented cardiac risk factors and symptoms prior to his death), and it is appropriately expressed in terms of medical probabilities as opposed to mere possibilities.

¶23. Second, MGH argues that Dr. Vanderlan's "opinion regarding aspirin" is insufficient "on its face" because he does not state that it is *more likely* than not that Lance would have survived had he been given an aspirin. MGH further argues that Dr. Vanderlan's deposition testimony is insufficient to establish causation because he did not identify the "specific treatments" Lance should have received following a full cardiac workup. However, Dr. Vanderlan's "opinion regarding aspirin" must be considered along with the entirety of his affidavit and deposition testimony, not in isolation.

¶24. As discussed above, Dr. Vanderlan testified more broadly that hospital patients who are diagnosed and treated "before they have [a myocardial infarction]" have a survival rate of "greater than 75 percent" and a mortality rate of "less than 25 percent." MGH argues that this testimony is insufficient to establish causation because it does not identify the "specific treatments" that Lance would have received if MGH had conducted a full cardiac workup and diagnosed his condition. In response, Jessica argues that it is impossible for Dr. Vanderlan or any expert to identify the *specific* course of treatment that Lance should have received because MGH completely failed to run necessary tests and evaluate Lance's

condition. Dr. Vanderlan opined that after giving Lance a chewable aspirin, MGH should have performed, among other tests, a "full, 12 lead EKG," serial cardiac enzyme tests, and a chest x-ray. However, "MGH did none of this." As a result, MGH failed to obtain a clear picture of Lance's condition at the time of his admission. Under these circumstances, Jessica argues that it is sufficient for Dr. Vanderlan to opine that patients like Lance, who present to a hospital *before* they have a myocardial infarction, have a survival rate of greater than seventy-five percent if properly diagnosed.

¶25. We agree that Dr. Vanderlan's testimony was sufficient to create a genuine issue of material fact for trial under Mississippi's loss-of-chance doctrine. "Mississippi law requires proof of causation to a degree of reasonable medical probability that—absent the alleged malpractice—a significantly better result was probable, or more likely than not (i.e., a greater than 50 percent chance of a substantially better outcome than was in fact obtained)." *Norman*, 262 So. 3d at 524 (¶13). In *University of Mississippi Medical Center v. Redd ex rel. Jefferson*, 412 So. 3d 341 (Miss. Ct. App. 2024), *cert. denied*, 413 So. 3d 587 (Miss. 2025), this Court rejected the defendant's argument that the plaintiff's expert testimony was insufficient to establish causation under a loss-of-chance theory because the expert did not identify a "specific test" or "specific course of treatment" that would have produced a better result. *Id.* at 354-57 (¶¶37-45). There, the expert testified that earlier diagnosis and treatment of an infection that developed following the patient's surgery would have provided the patient with a greater than fifty-percent chance of a better result. *Id.* at 356 (¶44). We held that such testimony was sufficient to support the trial judge's finding in favor of the

plaintiff following a bench trial. *Id.* Likewise, in this case, Dr. Vanderlan testified in his deposition that a full cardiac workup and timely diagnosis of Lance's condition would have provided a greater than fifty-percent chance of a better result, and this testimony is at least sufficient to create a genuine issue of material fact under Mississippi's loss-of-chance doctrine.

¶26. Finally, MGH argues that certain opinions in Dr. Vanderlan's affidavit were not competent summary judgment evidence because they were not timely disclosed or contradicted his prior sworn deposition testimony. Specifically, MGH argues that Dr. Vanderlan's affidavit contained "new" or "contradictory" opinions (1) that Lance died as a result of a myocardial infarction; (2) that the standard of care required MGH to use a "12-lead EKG" as opposed to a "simple EKG"; (3) and that MGH should have provided Lance with a 324 mg chewable aspirin.

¶27. We have already explained above that Vanderlan's opinion regarding Lance's cause of death did not contradict his deposition testimony. *See supra* ¶22. Moreover, Jessica's expert designation previously disclosed Dr. Vanderlan's opinions that Lance died of a myocardial infarction and that MGH's negligence caused or contributed to his death. Therefore, this opinion was neither new nor undisclosed.

¶28. In addition, Dr. Vanderlan did not provide a new or contradictory opinion when he stated in his affidavit that Lance "had an abnormal (tachycardic) one-lead EKG" and that MGH breached "the standard of care" and "the hospital's own protocols" by not using "a full, 12 lead EKG." Jessica's expert designation previously stated that Dr. Vanderlan would

15

opine that "MGH and its agents did not perform the necessary tests (*like a simple EKG*, blood work *or other non-invasive tests*) to begin a differential diagnosis that ruled out cardiac issues." (Emphasis added). And Dr. Vanderlan previously testified in his deposition that he would not be critical of MGH if it "had performed an EKG and it was normal." Throughout Dr. Vanderlan's deposition, he repeatedly discusses the fact that MGH did *not* perform "an EKG." The medical records are clear that MGH *did* use a single-lead EKG that showed that Lance was tachycardic (an elevated heart rate) but did *not* use a 12-lead EKG. These facts were never in dispute. In this context, it seems apparent to us that Dr. Vanderlan has always been critical of MGH for not using a 12-lead EKG, which is a common, painless, quick, and *non-invasive* procedure that provides greater detail than a single-lead EKG. If there was any confusion regarding what Dr. Vanderlan meant by "an EKG," MGH could have questioned him about that opinion during his deposition. However, Dr. Vanderlan's subsequent affidavit did not clearly contradict his expert designation or his deposition testimony or express any new opinion on this subject.

¶29.  Lastly, as to Dr. Vanderlan's opinion regarding aspirin, we note that Jessica's expert designation specifically stated that MGH violated its own protocols and then reprints the protocol requiring the hospital to provide a "324 mg chewable [aspirin] within 10 minutes of arrival" to a patient complaining of chest pain. The disclosures further stated that the hospital's breaches of the standard of care proximately caused Lance's death and that it was more likely than not that Lance would have survived if the hospital complied with the standard of care. Under these circumstances, we cannot say that Dr. Vanderlan's opinions

16

regarding aspirin were incompetent summary judgment evidence. We have explained that expert disclosures "do not, indeed cannot include everything that an expert witness will state at trial. The answer does not have to be a statement essentially as long as the testimony." *Peterson v. Ladner*, 785 So. 2d 290, 295 (¶20) (Miss. Ct. App. 2000).

¶30. In summary, Jessica provided testimony from a qualified expert who opined, to a reasonable degree of medical certainty, that Lance died of a myocardial infarction; that MGH breached the standard of care by uncritically accepting Lance's self-diagnosis of a panic attack and by failing to perform a full cardiac workup to rule out a cardiac issue; and that but for MGH's negligence, Lance had a greater than fifty-percent chance of survival. Under Mississippi's loss-of-chance doctrine, that evidence is sufficient to create a genuine issue of material fact for trial and survive summary judgment. On a motion for summary judgment, the court does not try issues of fact but only determines whether there are genuine issues of material fact to be tried. *Est. of Biddle v. Biddle*, 369 So. 3d 525, 529 (¶13) (Miss. 2023) (citing *Brown v. Credit Ctr. Inc.*, 444 So. 2d 358, 362 (Miss. 1983)). Accordingly, we reverse the circuit court's order granting summary judgment and remand the case for further proceedings consistent with this opinion.

¶31. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**